# IN THE COURT OF APPEALS OF TENNESSEE
## AT MEMPHIS
### April 18, 2012 Session

## SONG & SONG CORPORATION, and JIN Y. "JIM" SONG, Individually v. FINE ART CONSTRUCTION COMPANY, LLC, ET AL.

### Direct Appeal from the Chancery Court for Shelby County
### No. CH-07-02364, Part II     Arnold Goldin, Chancellor

---

### No. W2011-01708-COA-R3-CV - Filed June 14, 2012

---

Property owner hired a general contractor to perform construction work on a commercial building. The parties subsequently discovered that when the building was originally constructed, there were no fire dampers installed in the ductwork. The contractor performed the additional work necessary to install the missing fire dampers, but when the work was completed, the property owner refused to pay the amount invoiced by the contractor for the additional work. Both parties asserted that the other had breached the contract. Following a two-day bench trial, the trial court ruled in favor of the contractor and awarded her a judgment for the unpaid balance and other damages. The property owner appeals. We affirm as modified.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified and Remanded

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which HOLLY M. KIRBY, J., and J. STEVEN STAFFORD, J., joined.

Kevin A. Snider, Germantown, Tennessee, for the appellants, Song & Song Corporation and Jin Y. "Jim" Song, Individually

Roscoe A. Feild, Steven R. Walker, Memphis, Tennessee, for the appellees, Fine Art Construction Company, LLC, et al

## OPINION

## I.  FACTS & PROCEDURAL HISTORY

Song & Song Corporation owns property located on Winchester Road in Memphis, Tennessee.  The president of Song & Song Corporation is Jin Y. "Jim" Song, and he and his wife are its sole owners.  In 2005, Mr. Song hired a general contractor to construct a commercial building on the property.  However, the contract was only for the construction of the "shell" of the building and the completion of its top floor.  The interior of the building's first floor was to remain unfinished.  The contract work was completed around February of 2007, and Mr. Song began operating an office on the second floor of the building.

In May 2007, Mr. Song obtained a quote from the original contractor of $105,000 for the completion of the unfinished first floor.  Mr. Song then asked for a bid from another general contractor, Tae Young "Chris" Shin, who was an acquaintance from the Korean community and a close friend of Mr. Song's wife.  Ms. Shin had just recently obtained her general contractor's license, in April 2007, and Mr. Song had assisted her in preparing documents for the application process.  Mr. Song provided Ms. Shin with the detailed bid from the previous contractor in order to identify the scope of the work involved.  Ms. Shin agreed to complete the unfinished first floor of Mr. Song's building for $90,000, and the parties entered into a written contract to that effect on June 20, 2007.[1]  Ms. Shin began work shortly thereafter, and by all accounts, everything went smoothly for the next few weeks.

On August 2, 2007, a Shelby County Code Enforcement Officer issued a stop work order on the site.  Shelby County Code requires that fire dampers[2] be installed inside the ductwork of a multi-tenant commercial building, and two separate mechanical inspections must be performed by Code Enforcement Officers during the installation process.  At Mr. Song's building, fire dampers were required to be placed inside the ductwork that was above the first floor ceiling, between the first and second floors.  The stop work order was issued because the necessary inspections of the fire dampers had not taken place, and yet the first

---

[1]  The contract was between Song & Song Corporation and Fine Art Construction, LLC, of which Ms. Shin is the sole owner and president.  For ease of reference, we will refer to the parties simply as Mr. Song and Ms. Shin for much of this opinion, just as the parties have done in their briefs.

[2]  According to the testimony at trial, during a structure fire, a fire damper prevents the fire from spreading through the ductwork. Ductwork would normally attract smoke and fire because it moves air.  A fire damper has a band similar to a heat strip, and in the event of a fire, the strip reaches a certain temperature and causes the fire damper to close.  The fire damper then terminates the air flow through the ductwork and isolates the fire.

floor ceiling had already been covered with sheetrock, precluding access to the ductwork above the ceiling. It was later discovered that fire dampers had never been installed in the ductwork.

Ms. Shin informed Mr. Song about the stop work order and the lack of fire dampers. She claimed that the fire dampers should have been installed by the previous contractor who began the process of installing the ductwork. Ms. Shin, and her subcontractor, ultimately installed the necessary fire dampers and obtained the necessary approval of them from the Code Enforcement Officer on September 21.

Mr. Song paid the $90,000 contract price prior to the completion of the work, and he also paid a total of $8,904.90 toward invoices he received for the additional work. On September 25, Mr. Song gave Ms. Shin a written "Incentive Agreement," which stated that Song & Song Corporation promised to pay her $5,000 if she obtained a temporary use and occupancy permit for the first floor by October 15, so that Mr. Song's tenants could begin to move in. Ms. Shin completed her work and passed the mechanical, electrical, and plumbing inspections by October 10. However, Mr. Song fired Ms. Shin on October 11, before she could obtain the final inspection necessary to obtain the aforementioned permit. Mr. Song obtained the permit himself on October 16. Ms. Shin submitted a final invoice to Mr. Song after she was terminated, which stated that he still owed an additional $16,927.28 for materials and additional work that was completed prior to her termination.

Mr. Song, individually, along with Song & Song Corporation, filed this lawsuit against Ms. Shin and Fine Art Construction, LLC on December 4, 2007. He alleged that he had experienced "numerous and continuing problems with the work that Defendants performed as well as with the time line of the work being completed." The complaint mentioned the fact that the work had failed to clear a mechanical inspection, requiring the removal of sheetrock and the installation of fire dampers. The complaint alleged that the resulting delay had caused him to lose a commercial tenant and incur substantial damages. The complaint alleged breach of contract/warranty, fraud/misrepresentation, violation of the Tennessee Consumer Protection Act, "money had and received," unjust enrichment, and negligent/reckless acts or omissions. It sought $100,000 in compensatory damages, treble damages, $300,000 in punitive damages, and attorney's fees, among other things.

Ms. Shin and her construction company filed an answer and a countercomplaint, alleging that she had completed the contract work and the additional work, for which Mr. Song had allegedly promised to pay. Ms. Shin alleged that Mr. Song had improperly terminated her after she completed her work, rendering it impossible for her to obtain the final inspection within the incentive payment period. Thus, Ms. Shin claimed that she was entitled to damages for the outstanding invoice balance, the incentive bonus, and attorney's

fees.

A two-day bench trial was held in May 2011. The written contract entered into by the parties listed various items to be completed, and, relevant to this appeal, it stated, "The heating and air will be completed by the installation of a five ton condenser, duct-work, and restroom exhaust fan." However, it did not mention fire dampers. Similarly, the bid from the previous contractor, which Mr. Song provided to Ms. Shin in order to show her the scope of work involved, mentioned ductwork but not fire dampers. Mr. Song testified that he did not know why fire dampers were not mentioned in the contract, stating, "I just assumed if fire dampers are necessary, they should be included." Mr. Song said that he did not know that fire dampers had not already been installed, and he explained that he did not even know what a fire damper was at the time of contracting.[3]

Mr. Song testified that after the stop work order was issued at the beginning of August, Ms. Shin told him that there was a problem with the initial mechanical inspection. According to Mr. Song, an inspector then pointed out that fire dampers are required when more than one tenant will be occupying a building, and that Ms. Shin had covered the ceiling before a fire damper inspection was performed.

It was undisputed that Ms. Shin installed the necessary fire dampers and received the required approval from the Code Enforcement Officer on September 21. Mr. Song said that he and Ms. Shin had never discussed a "dollar amount" for the additional work that would be required to install the fire dampers. He testified that around September 24 or 25, Ms. Shin informed him that she had run out of money and needed additional money to complete the work. He said Ms. Shin also told him that the fire dampers should have been installed by the previous contractor. Mr. Song said that he still had some "retainer" money that he had not paid to the previous contractor, so he paid $5,904 of that money to Ms. Shin because he "had to pay her to complete the work first." Mr. Song also made another $3,000 payment to Ms. Shin at some point. He acknowledged that he paid these amounts to Ms. Shin for the additional work due to the fire dampers.

Mr. Song testified that he gave Ms. Shin the "Incentive Agreement" for $5,000 on September 25 because he was trying to keep from losing his commercial tenant, who was supposed to have been occupying a first floor suite as of September 1. Mr. Song said that he had entered into the lease agreement with the tenant on June 1, before he entered into the construction contract with Ms. Shin on June 20, and he claimed that Ms. Shin was aware of

---

[3] Prior to Ms. Shin's completion of the work, Mr. Song passed the required examination to become a licensed general contractor himself, in August 2007. He had previously taken a class in preparation for the exam, but he testified that he did not learn about fire dampers at the class.

the tenant's lease when she entered into the contract. According to Mr. Song, his tenant terminated the lease on or about October 3, and so Mr. Song then terminated Ms. Shin on October 11.

The next witness to testify was Roy Scobey, who was the architect who drew up the plans for the initial construction of the building by the previous contractor. Ms. Shin had obtained these plans from Mr. Scobey shortly after signing the contract. Mr. Scobey testified that the plans he prepared included some of the mechanical equipment to be placed above the ceiling of the first floor, but it did not include anything for the actual first floor level of the building because that work was not going to be performed at that time. Mr. Scobey testified that Shelby County Code requires that fire dampers be installed at any location where a duct penetrates a fire rated wall or ceiling. He said that most *mechanical* contractors would be aware of this requirement, but as for general contractors, like Ms. Shin, he said "they might" be aware of the requirement, "but not be as well versed as a mechanical contractor might be." Mr. Scobey said that fire dampers were not installed in the ductwork during the initial phase of construction because the ductwork was confined to the space above the first floor ceiling, and did not penetrate a ceiling or wall, so fire dampers were not necessary. According to Mr. Scobey, when the first floor construction began, "You would take the ductwork that is already in the second floor, you would be adding ductwork in the first floor and you would be placing that fire damper in between the two where they connect[.]"

The general contractor who constructed the shell of the building, Greg Pilcher, testified as well. Mr. Pilcher could not recall exactly how much ductwork he installed on the first floor, but he acknowledged that some ductwork was installed that came down into the first floor. Mr. Pilcher explained that the first and second floor had separate heating and air conditioning systems, but the furnaces for both systems were on the second floor. When the first floor was completed, he said, the ductwork for the separate system would have to be completed, and it would "tie in" to the existing system on the second floor. Mr. Pilcher said that the fire dampers would typically be at the ceiling or "sheetrock level" where the two connected, but they could also be "somewhere above," at the floor level. Mr. Pilcher testified that he did not install fire dampers in Mr. Song's building because, at the time, it was not occupied by multiple tenants, and therefore there was no need for fire dampers. He could not recall whether the ductwork he installed was "blocked off" or left open. He also said, "I don't know if the ductwork, you know, whatever was stuffed out there made someone believe [that fire dampers] were there or not."

A.J. Szot was the mechanical contractor hired by Ms. Shin as a subcontractor to complete the heating and air conditioning work and ductwork on the first floor. He testified that the "main branches" of the ductwork on the first floor had already been installed by the

previous contractor before he began his work. Mr. Szot testified that one cannot tell whether a fire damper has already been installed inside ductwork just by looking at it. As a result, he said that he did not know whether fire dampers had already been installed in Mr. Song's building. Mr. Szot explained that the ductwork was already sealed and "completely closed" and said, "I just couldn't start cutting the ductwork. It was [a] professional job, looking good."

Mr. Szot testified that after the stop work order was issued and it was discovered that there were no fire dampers, he went back and installed the missing fire dampers. He said that he had to cut into the existing ductwork, and because the fire dampers would not fit into the correct position, the ductwork had to be redirected at every location where a fire damper was installed.

The Code Enforcement Officer who issued the stop work order on August 2 testified that after it was issued, the original engineer on the job withdrew, so he later met with another architect at the jobsite in order to decide exactly how to install the fire dampers in the existing ductwork. Ms. Shin was required to resubmit the appropriate plans from the architect, and obtain approval of those plans, before the inspections could take place. The inspector testified that the "above ceiling" inspection finally took place on September 21, and the final mechanical inspection was passed on October 9.

Don Sloan was tendered as an expert witness by Mr. Song. Mr. Sloan was not himself a licensed general contractor, but he had taken the necessary examination and was a license holder for his employer. Mr. Sloan testified that he had reviewed the written contract between Mr. Song and Ms. Shin, as well as "the plans and specifications and items that were being asked to be done . . . and that type of thing," and he found nothing to indicate from those documents that fire dampers had previously been installed by Mr. Pilcher. Mr. Sloan testified that if there was existing ductwork when the work began, the general contractor would have a responsibility to determine whether it complied with Code. He said that if he did not know whether fire dampers had already been installed, then he would obtain an on-site inspection or contact the mechanical engineer who designed the original portion of the work in order to gain that information.

Finally, the court heard testimony from Ms. Shin. She testified that the bid provided to her by Mr. Song, which he had obtained from the original contractor, and given to her in order to show her the scope of work, did not mention fire dampers. Consequently, she testified, her estimate did not include the installation of fire dampers either. Ms. Shin pointed out that the parties' written contract similarly did not mention fire dampers. Ms. Shin testified that when she began her work, there was existing ductwork in the first floor that had been installed by the previous contractor, including eight "trunks" coming down from the

second floor. She said that one could not tell from observation whether fire dampers were already inside the ducts because they were completely sealed. However, she said that she had other evidence indicating that the fire dampers had already been installed. She testified that she obtained a copy of the original building plans from Mr. Song, which had been prepared by Mr. Scobey for the construction work that had already been completed, in order to determine the condition of the building. She said that those building plans clearly showed fire dampers and details for their installation, and therefore, the fire dampers should have been installed by whoever installed the ductwork shown on the plans. A large set of architectural plans, prepared by Mr. Scobey's office, was submitted into evidence. Those plans indicate ductwork coming "down from attic" at eight locations on the first floor. At each of those locations, there is a symbol which, according to the legend, indicates a horizontal fire damper, and there is also a designation of "FD" at each of the eight locations. Ms. Shin testified that FD means fire damper. On a separate sheet, there is a "Fire Damper Detail Floor Mount," explaining the intricacies of installing the fire dampers.

In short, Ms. Shin testified that she did not call for an inspection of the fire dampers once she began the work because the building plans she was given showed that fire dampers had already been installed, and Mr. Song told her that he had already obtained a use and occupancy permit for the building. Ms. Shin testified that a use and occupancy permit is not issued unless the building is built correctly. Thus, according to Ms. Shin, she had no reason to question the existence of the fire dampers. Ms. Shin said that she first learned that there were no fire dampers after the Code Enforcement Officer issued the stop work order.

Ms. Shin testified that she immediately informed Mr. Song when the stop work order was issued and when she later learned that fire dampers had not been installed by the previous contractor. According to Ms. Shin, Mr. Song asked if this problem was going to cost her extra money, and he initially suggested that she ask the previous contractor, Mr. Pilcher, to pay for it. Ms. Shin said she informed Mr. Song that she could not do that because she had taken the job away from Mr. Pilcher, but, she said she told Mr. Song that if it turned out to be a small expense, around a thousand dollars, then she would do it without asking for extra money. Ms. Shin testified around August 29, she informed Mr. Song that the additional work required to install the eight fire dampers was going to cost a lot more than a thousand dollars, and that she could not be responsible for the additional cost. According to Ms. Shin, Mr. Song then told her that he still had $12,000 of the "retainer" money he owed to Mr. Pilcher, and he said that he hoped the problem could be resolved with that money. However, she said the parties never agreed upon a certain "dollar amount." Ms. Shin testified that the parties ultimately agreed that she would bill him for the additional work, because she not did not know how much it would eventually cost, or even how the work would have to be completed.

Ms. Shin testified that it in order to complete the additional work, it was necessary to tear down some of the completed work, such as firewalls, and then the existing ductwork had to be cut with a saw in order to access the locations where the fire dampers should have been installed. Ms. Shin testified that she invoiced Mr. Song as the work progressed for the amounts that she was spending, and Mr. Song paid two of the invoices, for a total of $8,904.90 above the contract price, but the remaining balance had not yet been invoiced at that time. She testified that the fire dampers were installed on September 19 and ultimately approved on or about September 20.

Ms. Shin testified that Mr. Song gave her the incentive agreement on September 25, and that she experienced no further problems until she was abruptly terminated on October 11. Ms. Shin said she had already obtained the final electrical, mechanical, and plumbing inspections by that time, and there was no more work to be completed. She said that she could have obtained the final inspection by October 15, but Mr. Song made it impossible for her to do so when he terminated her on October 11.

At the conclusion of the two-day bench trial, the trial court dismissed all of the claims in Mr. Song's original complaint, and it entered a judgment against Song & Song Corporation on Ms. Shin's counterclaims, to include $16,927.28 for the outstanding invoice balance and $5,000 for the incentive payment, in addition to prejudgment interest and attorney's fees. Mr. Song and Song & Song Corporation timely filed a notice of appeal.

## II. ISSUES PRESENTED

The appellants present ten issues for review:

1. Whether the trial court erred in granting Ms. Shin damages based on alleged contract modifications that were neither in writing nor signed by either party;
2. Whether the trial court erred in granting the amount of damages that it awarded to Ms. Shin;
3. Whether the trial court erred in granting damages to Ms. Shin without expert proof of her damages;
4. Whether the trial court erred in granting damages to Ms. Shin given that she filed her countercomplaint with unclean hands;
5. Whether the trial court erred in granting damages to Ms. Shin given that her actions demonstrated bad faith;
6. Whether the trial court erred in dismissing Mr. Song's claim for breach of contract/warranty;
7. Whether the trial court erred in dismissing Mr. Song's claim for fraud/misrepresentation;

8.    Whether the trial court erred in dismissing Mr. Song's claim for violation of the Consumer Protection Act;

9.    Whether the trial court erred in dismissing Mr. Song's claim for money had and received as well as unjust enrichment; and

10.   Whether the trial court erred in dismissing Mr. Song's claim for negligent and/or reckless acts or omissions.

We will address each of these issues, though not necessarily in the order presented.

## III.   STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them.  Tenn. R. App. P. 13(d) (2011); ***Bogan v. Bogan***, 60 S.W.3d 721, 727 (Tenn. 2001).  For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect.  ***Watson v. Watson***, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)).   "When issues of credibility and weight of testimony are involved, we afford considerable deference to the trial court's findings of fact."  ***Larsen–Ball v. Ball***, 301 S.W.3d 228, 235 (Tenn. 2010) (citing *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007)).  "Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary."  ***Hughes v. Metro. Gov't of Nashville & Davidson County***, 340 S.W.3d 352, 360 (Tenn. 2011) (citing *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999)).

The interpretation of a contract is a question of law.  ***Security Fire Protection Co., Inc. v. Huddleston***, 138 S.W.3d 829, 834 (Tenn. Ct. App. 2003).  We review a trial court's conclusions of law under a de novo standard upon the record with no presumption of correctness.  ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV.   DISCUSSION

### A.   Breach of Contract

We begin by addressing Mr. Song's contention that, contrary to the trial court's conclusion, it was Ms. Shin who breached the parties' contract.  He essentially claims that she breached the contract by failing to discover the lack of fire dampers herself.

The parties' written contract provided that Ms. Shin would provide the labor, services, and/or materials to perform the construction work described on Exhibit A to the contract. Relevant to this appeal, Exhibit A provided that the "heating and air will be completed by the installation of a five ton condenser, duct-work, and restroom exhaust fan." It did not mention fire dampers. The written contract also stated, "The work upon the Subject Property will be in accordance with drawings and specifications provided by Owner, which drawings and specifications are hereby made a part of this Agreement." The trial court noted that those drawings and specifications consisted of the original building plans prepared by Mr. Scobey, which were used for the construction of the building, and which were provided to Ms. Shin. Thus, the trial court concluded that Ms. Shin was entitled to rely upon the building plans. The court found it undisputed that according to the original building plan, the fire dampers should have already been installed. The court also found that the ductwork where the dampers should have been located had already been "brought down" to the first floor, and that fire dampers cannot be seen after they are installed in the ductwork.

The court found that the situation that arose in this case was governed by Paragraph 14 of the parties' written contract, which stated:

14. Concealed Conditions. If Contractor should encounter concealed conditions that were not reasonably anticipated by Contractor at the time of execution of this Construction Agreement, Contractor shall bring the existence and nature of such concealed conditions to the attention of Owner. If such concealed conditions prevent, preclude, or obstruct performance by Contractor of the work herein prescribed, or burden the scope of work as herein defined by requiring additional work by Contractor to address, correct, and/or rectify such concealed defects, then the scope of work and Contract Price as hereinabove defined shall be adjusted in accordance with [Paragraph] 10 to account for all courses of action necessary to address, correct, and/or rectify such concealed conditions.

The referenced Paragraph 10 stated:

10. Allowances. If the Contract Price, as hereinabove defined, includes allowances of any kind or character, and the cost of performing the work covered by an allowance is either greater or less than the allowance, then this Agreement shall be increased or decreased accordingly. Unless otherwise requested by Owner in writing, Contractor shall use its judgment in accomplishing work covered by an allowance. If Owner requests that work covered by an allowance be accomplished by the Contractor in such a way that the cost will exceed the allowance, Contractor will be obligated to comply with

Owner's request only upon payment by Owner of the additional costs in advance.

The trial court concluded that the lack of fire dampers was clearly a concealed condition, and it noted Ms. Shin's testimony that she immediately notified Mr. Song of the problem. The trial court expressly found that a discussion took place between Mr. Song and Ms. Shin in which the parties agreed that this additional work needed to be done. The court went on to find that "she did it and she billed him for it, and he didn't pay for it." The court noted that the invoice provided by Ms. Shin showed that the additional unpaid charges "that were incurred in correcting this matter" totaled $16,927.28, and it awarded that amount to Ms. Shin, plus prejudgment interest.[4]

With regard to the incentive agreement, the court found that Ms. Shin had passed the final plumbing, electrical, and mechanical inspections before she was terminated, and that the final inspection was "just a formality" at that point, as there was no basis for denying the final permit once the other inspections had been completed. As a result, the court found that Ms. Shin was also entitled to an award of $5,000 pursuant to the incentive agreement.

We find the trial court's analysis to be well-reasoned and thorough, and we agree with its factual findings and ultimate conclusion that Ms. Shin did not breach the parties' contract. The contract provided that the work would be completed in accordance with drawings and specifications provided by Mr. Song, and those drawings reflected that fire dampers had already been installed during the first phase of construction. We agree with the trial court's conclusion that the "concealed condition" paragraph in the parties' contract governed the situation at hand. According to that provision, if Ms. Shin encountered a concealed condition that was not reasonably anticipated by her at the time of execution of the contract, she was required to bring it to the attention of Mr. Song, and it is undisputed that she did so. The contract provided that if the concealed condition required additional work by Ms. Shin to address or correct the concealed defect, "then the scope of work and Contract Price . . . shall be adjusted in accordance with [Paragraph] 10 to account for all courses of action necessary to address, correct, and/or rectify such concealed conditions." Paragraph 10 similarly provided that if the cost of performing work exceeded the allowance, the agreement "shall be increased" accordingly. It further stated that unless otherwise requested by Mr. Song in

---

[4] The court also noted Mr. Song's contention that Ms. Shin should be liable for the damages caused by the delays, but the court found that the following contract provision precluded such liability:

13. Delay. Contractor shall be not be liable to Owner or any person, corporation, partnership or other legal entity claiming by, through, or under Owner for any delays in completion of this Agreement regardless of the cause, source, or nature of such delays.

writing, Ms. Shin was to use her judgment in accomplishing the work. It is undisputed that Mr. Song did not make such a written request in this case. The trial court found that the parties had a discussion in which they agreed that the additional work needed to be done. We recognize that Paragraph 10 stated that if Mr. Song requested that work be accomplished in such a way that its cost would exceed the allowance, Ms. Shin would only be *obligated* to comply with his request upon payment of the additional costs in advance. Here, Ms. Shin did not demand payment in advance, but instead billed Mr. Song for the additional work as it was completed. However, there is nothing in the contract to prevent her from doing so. She simply chose not to exercise her right to demand payment in advance. This does not mean that she was not entitled to payment for the additional work. The aforementioned provisions had already declared that the contract price "shall be adjusted . . . to account for all courses of action necessary to address, correct, and/or rectify" the concealed condition.

On appeal, Mr. Song cites several other provisions of the contract, which, he contends, entitle him to relief. The first is Paragraph 9, which stated:

> 9. Extra Work and Deviations from Original Contract Work. Should Owner, construction lender if any, or any public or governmental agency or inspector direct any deletion from, modification of, or addition to the work as hereinabove specified, the costs of such deletion(s), modification(s), or addition(s) shall be added to or deducted from the Contract Price, as hereinabove defined, as the circumstances dictate. Any and all deletions from, modifications of, or additions to the scope of work prescribed by this Construction Agreement together with the adjustment to Contract Price shall be made or otherwise memorialized in a writing signed by Owner and Contractor prior to the arias (sic) of any obligation of whatsoever kind or character on the part of the Contractor to recognize, honor, or adhere to such changes.

We find that this provision actually supports Ms. Shin's position in this case. Like the previously discussed paragraphs, this section provides that the cost of additions to the work "shall be added" to the contract price, as the circumstances dictate. It also provides that additions to the work, together with the adjustment to the contract price, shall be made in writing prior to the arising of any obligation *on the part of Ms. Shin* to adhere to the changes. Again, Ms. Shin chose not to exercise this right to demand a written contract modification, but that does not mean that she is not entitled to payment for the additional work she performed.

Mr. Song also cites Paragraph 20 of the contract, which states, "With respect to all matters not governed by [Paragraph] 9 hereof, this Agreement may not be modified except

-12-

by separate written instrument executed by Owner and Contractor." He basically argues that because the written contract only required him to pay $90,000, he cannot now be required to pay any additional amounts. He argues that because Ms. Shin did not sign the incentive agreement, he cannot be forced to pay the $5,000 incentive payment. He also asks for a return of the $8,904.90 he paid to Ms. Shin prior to the termination of the contract because, he contends, there is no signed writing requiring his payment of such. This alleged "overpayment" by Mr. Song forms the basis of his claims for "money had and received" and unjust enrichment.

We disagree with Mr. Song's contention that there is no signed writing requiring him to pay more than $90,000. The concealed condition paragraph of the parties' written contract, along with the other provisions previously discussed, clearly addressed the situation in which additional work was to be performed, and provided that the contract price would be increased accordingly. But, even if we characterize the additional work, and the incentive agreement, as modifications to the original contract, they are nevertheless enforceable because both parties clearly agreed to them, despite the lack of an additional signed writing. As this Court recently explained in *Lancaster v. Ferrell Paving, Inc.*, No. W2010-02632-COA-R3-CV, 2011 WL 4357308, at *3 (Tenn. Ct. App. Sept. 20, 2011) *perm. app. denied* (Tenn. Feb. 15, 2012):

> After a written contract is made, it may be modified by the express words of the parties in writing or by parol, where both parties consent to such modifications. *In re Estate of Nelson*, No. W2006-00030-COA-R3-CV, 2007 WL 851265, at *18 (Tenn. Ct. App. Mar. 22, 2007) (citing *Galbreath v. Harris*, 811 S.W.2d 88, 91-92 (Tenn. Ct. App. 1990)). "Generally, Tennessee courts follow the rule that 'allows contracts to be orally modified even if the contracts specifically state that the contract can only be modified in writing.'" *Markow v. Pollock*, No. M2008-01720-COA-R3-CV, 2009 WL 4980264, at *8 (Tenn. Ct. App. E.S. Dec. 22, 2009) (quoting *Moulds v. James F. Proctor, D.D.S., P.A.*, 1991 WL 137577, at *3 (Tenn. Ct. App. W.S. July 29, 1991)). "Even where the written contract prohibits oral modifications of the agreement, oral alterations will still be given effect if otherwise valid, as 'men cannot tie their hands or bind their wills so as to disable them from making any contract allowed by law, and in any mode in which it may be entered into.'" *Estate of Nelson*, 2007 WL 851265, at *18 (quoting *Co–Operative Stores Co. v. U.S. Fid. Guar. Co.*, 137 Tenn. 609, 195 S.W. 177, 180 (Tenn. 1917)). "A party's agreement to a modification need not be express, but may be implied from a course of conduct; this is true even where the agreement expressly specifies, as in this case, that the parties may only modify the agreement in writing." *Constr. Crane & Tractor, Inc.* [*v. Wirtgen Am., Inc.*, No. M2009-

01131-COA-R3-CV, 2010 WL 1172224, at *10 (Tenn. Ct. App. Mar. 24, 2010)] (citing *Galbreath*, 811 S.W.2d at 91; *Cooperative Stores Co.*, 195 S.W. at 180).

Because the parties here clearly agreed for Ms. Shin to perform the additional work, and they agreed to the subsequent incentive agreement, those agreements are valid and enforceable, and Mr. Song may not avoid his obligations thereunder simply because of the lack of an additional signed writing.

We note that Mr. Song also argues that the statute of frauds bars Ms. Shin from recovering in this case. He contends that "[t]he interior renovations contract at bar is a contract that could be performed by Ms. Shin in less than one year and thus is among the category of contracts that must be in writing signed by the party to be charged." Contrary to Mr. Song's assertion, however, the statute of frauds applies to a "contract which is *not* to be performed within the space of one (1) year." Tenn. Code Ann. § 29-2-101(a)(5). Therefore, his argument on this issue is without merit.

Finally, with regard to the enforceability of the contract, Mr. Song argues that his agreement to pay "whatever would be reasonable" for the additional work is not sufficiently definite to be enforced, and also fails for lack of consideration. We find that the additional work performed by Ms. Shin constituted adequate consideration, and that the contract provisions discussed at length earlier in this opinion provide sufficiently definite terms for the agreement to be enforced.

### B. Mr. Song's Other Claims

Mr. Song argues on appeal that the trial court erred in dismissing his claims against Ms. Shin for fraud/misrepresentation, violation of the Tennessee Consumer Protection Act, and negligent and/or reckless acts or omissions. Mr. Song's allegations that formed the basis for these claims arose out of Ms. Shin's conduct in the performance of the contract and mirrored his allegations on the breach of contract claim. Finding no evidence to support Mr. Song's allegations relative to these claims, we affirm the trial court's decision to dismiss them. We likewise find no bad faith or unclean hands on the part of Ms. Shin that would preclude her from recovering under the parties' contract.

### C. Damages

Mr. Song's next argument on appeal is that the trial court erred in awarding contract damages to Ms. Shin because she did not present expert testimony regarding the amount of her damages. Instead, she testified herself as to remaining balance that she invoiced to Mr.

-14-

Song, which he refused to pay. Mr. Song did not raise this argument in the trial court, but on appeal, he relies upon the case of **Walls v. Conner**, No. E2007-01917-COA-R3-CV, 2008 WL 4735311 (Tenn. Ct. App. Oct. 27, 2008). In **Walls**, a trial court refused to allow a contractor's expert witnesses to testify due to his repeated failure to respond to discovery, and the Court of Appeals affirmed. **Walls** did not state that expert testimony is *required* in a construction contract case. "There is a seemingly endless list of areas in which expert testimony has been admitted. This list will continue to grow as the complexity of our civilization increases, as knowledge burgeons, and as specialization grows." Robert E. Burch, *Trial Handbook for Tenn. Lawyers* § 24:17 (2012 ed.). However, Mr. Song has failed to cite any requirement, established by a court or by the legislature, that expert testimony must be presented in order to prove a contractor's damages in a breach of contract case. Therefore, this issue is without merit. *Compare* **Jordan v. Clifford**, No. E2009-01121-COA-R3-CV, 2010 WL 2075871, at *5 (Tenn. Ct. App. May 25, 2010) (rejecting the contention that a breach of contract claim against an attorney cannot be sustained without expert proof); **Gamble v. Perra**, No. E2006-00229-COA-R3-CV, 2007 WL 541818, at *4 (Tenn. Ct. App. Feb. 22, 2007) (stating that the plaintiff's breach of contract claim against a physician did not require expert proof).

Next, we will address Mr. Song's contention that the trial court granted an "excessive" amount of damages to Ms. Shin. As support for this argument, Mr. Song cites Paragraph 12 of the parties' contract, which provides that if, after executing the agreement, Mr. Song refused to permit Ms. Shin to proceed with the construction work, liquidated damages equal to thirty percent of the contract price were to be awarded to Ms. Shin. Mr. Song contends that the liquidated damages provision is inapplicable to this situation. Before the trial court, Ms. Shin requested an award of liquidated damages pursuant to this provision, in addition to the unpaid contract balance and incentive payment, but the trial court did not make such an award in its final order.[5] Because liquidated damages were not awarded to Ms. Shin, Mr. Song's argument with regard to this issue is without merit.

Next, Mr. Song argues that this Court should overturn the trial court's award of attorney's fees to Ms. Shin, basically because he contends that she should not have prevailed on the substantive issues at trial. Because we have affirmed the trial court's order in all other respects, we also affirm its award of attorney's fees. The contract provided that in the event that either party instituted judicial proceedings to secure performance of the obligations set forth in the contract, the prevailing party was entitled to recover reasonable attorney's fees. Pursuant to this provision, we find that Fine Art Construction Company, LLC is entitled to recover its reasonable attorney's fees incurred on appeal, and we hereby remand this matter to the chancery court for the determination of a reasonable award.

---

[5] Ms. Shin does not appeal that decision.

Finally, Ms. Shin has requested an award of postjudgment interest. Tennessee Code Annotated section 47-14-122 provides that "[i]nterest shall be computed on every judgment from the day on which the jury or the court, sitting without a jury, returned the verdict without regard to a motion for a new trial." This statute is mandatory, and courts are not free to ignore it. *State v. Thompson*, 197 S.W.3d 685, 693 (Tenn. 2006). "The failure of a trial court's judgment or decree to specify post-judgment interest does not abrogate the obligation imposed by the statute." *Id.* In fact, "a plaintiff is not required to move for an award of post-judgment interest in the trial court as the issue does not become ripe until the conclusion of the appellate process." *Ali v. Fisher*, 145 S.W.3d 557, 565 (Tenn. 2004) (citing Tenn. R. App. P. 41).

> "A party's right to post-judgment interest is based on its entitlement to the use of proceeds of a judgment. The purpose of post-judgment interest is to compensate a successful plaintiff for being deprived of the compensation for its loss between the time of the entry of the judgment awarding the compensation until the payment of the judgment by the defendants. Accordingly, a party who enjoys the use of funds that should have been paid over to another party should pay interest on the retained funds."

*Thompson*, 197 S.W.3d at 693 (quoting *Varnadoe v. McGhee*, 149 S.W.3d 644, 649 (Tenn. Ct. App. 2004)). In accordance with these principles, Fine Art Construction Company, LLC is entitled to postjudgment interest from the date of the trial court's judgment, which is hereby modified to include such an award.

## V.  CONCLUSION

For the aforementioned reasons, the decision of the chancery court is hereby affirmed as modified, and this matter is remanded for further proceedings consistent with this opinion. Costs of this appeal are taxed to the appellants, Jin Y. "Jim" Song and Song & Song Corporation, and their surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.